1  **WOLF HALDENSTEIN ADLER**
2  **  FREEMAN & HERZ LLP**
   BETSY C. MANIFOLD (182450)
   RACHELE R. BYRD (190634)
3  ALEX J. TRAMONTANO (276666)
   750 B Street, Suite 1820
4  San Diego, CA 92101
   Telephone: (619) 239-4599
5  Facsimile: (619) 234-4599
   manifold@whafh.com
6  byrd@whafh.com
   tramontano@whafh.com
7
   *Attorneys for Plaintiff*
8  [*Additional Counsel Listed Below*]

9                  **UNITED STATES DISTRICT COURT**

10              **SOUTHERN DISTRICT OF CALIFORNIA**

11

12  ELLA KANNER, Derivatively on Behalf    Case No.:  **'23 CV 2293 MMA DEB**
13  of Nominal Defendant ACADIA
14  PHARMACEUTICALS INC.,

15              Plaintiff,

16       v.                                **VERIFIED  SHAREHOLDER**
                                            **DERIVATIVE COMPLAINT**
17
18  JULIAN C. BAKER, STEPHEN R.
    BIGGAR, M.D., PHD., DANIEL B.
19  SOLAND, LAURA A. BREGE,               **DEMAND FOR JURY TRIAL**
    STEPHEN R. DAVIS, ELIZABETH A
20  GAROFALO, M.D., JAMES M. DALY,
21  EDMUND P. HARRIGAN, M.D., AND
    SRDJAN (SERGE) STANKOVIC,
22
23              Defendants,

24              and,

25
    ACADIA PHARMACEUTICALS, INC.,
26
27              Nominal Defendant.

28

Plaintiff Ella Kanner ("Plaintiff"), by and through her undersigned counsel, derivatively on behalf of Nominal Defendant Acadia Pharmaceuticals, Inc. ("Acadia" or the "Company"), submits this Verified Shareholder Derivative Complaint (the "Complaint"). Plaintiff's allegations are based upon her personal knowledge as to herself and her own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by Acadia with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE AND SUMMARY OF THE ACTION

1. This is a shareholder derivative action brought on behalf of and for the benefit of Acadia, against certain of its officers and/or directors named as defendants herein seeking to remedy their breaches of fiduciary duties between September 9, 2019 through April 5, 2021 ("Relevant Period"). Defendants' actions have caused, and will continue to cause, substantial financial harm and reputational damage to Acadia.

2. Acadia is a biopharmaceutical company that focuses on the development and commercialization of small molecule drugs that address unmet medical needs in central nervous system disorders. The Company is developing pimavanserin as a treatment for dementia-related psychosis and as an adjunctive treatment for schizophrenia, as well as an adjunctive treatment for major depressive disorder.

3. In April 2016, the U.S. Food and Drug Administration ("FDA") approved pimavanserin for the treatment of hallucinations and delusions associated with Parkinson's disease psychosis ("PDP").

1
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

4.      Following the PDP approval, the Company sought to obtain FDA approval for greatly expanded use of the drug to treat other main types of dementia-related psychosis ("DRP"). The Company launched what they touted as a significant Phase III trial, known as the HARMONY trial (the "Harmony Study"), to further study the drug's effectiveness in a range of DRP patients.

5.      On September 9, 2019, the Company announced positive results for the Harmony Study and further announced that it was stopping the Harmony Study early because its results were so overwhelmingly positive. Moreover, Defendants announced that the overwhelmingly positive results set a firm foundation for Acadia to file a Supplemental New Drug Application ("sNDA") that would support FDA approval of pimavanserin as a treatment for all forms of DRP.

6.      In June 2020, Acadia submitted an sNDA with the FDA to expand pimavanserin's label to include treatment for dementia-related psychosis (the "pimavanserin sNDA").

7.      Throughout the Relevant Period, Defendants made materially false and misleading statements regarding the Company's business, operations, and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the materials submitted in support of the pimavanserin sNDA contained statistical and design deficiencies; (ii) accordingly, the pimavanserin sNDA lacked the evidentiary support that the Company had led investors to believe it possessed; (iii) the FDA was unlikely to approve the pimavanserin sNDA in its present form; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

8.      On March 8, 2021, post-market, Acadia issued a press release providing a regulatory update on the pimavanserin sNDA, disclosing "that the Company received a notification from the [FDA] on March 3, 2021, stating that,

2

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

as part of its ongoing review of the Company's [sNDA], the FDA has identified deficiencies that preclude discussion of labeling and post-marketing requirements/commitments at this time." Acadia advised that "[t]he notification does not specify the deficiencies identified by the FDA and there has been no clarification by the FDA at this time."

9. On this news, Acadia's stock price fell $20.76 per share, or 45.35%, to close at $25.02 per share on March 9, 2021.

10. Then, on April 5, 2021, pre-market, Acadia issued a press release announcing that the Company had received a Complete Response Letter ("CRL") from the FDA indicating that the pimavanserin sNDA could not be approved in its current form. Specifically, the press release stated that "the [FDA Division of Psychiatry], in the CRL, cited a lack of statistical significance in some of the subgroups of dementia, and insufficient numbers of patients with certain less common dementia subtypes as lack of substantial evidence of effectiveness to support approval."

11. On this news, Acadia's stock price fell $4.41 per share, or 17.23%, to close at $21.18 per share on April 5, 2021.

12. Because of this misconduct, Plaintiff, through her counsel, served a pre-suit litigation demand on the Board of Directors ("Board") on August 30, 2021 (the "Demand"). Attached hereto as **Exhibit A**, is a true and correct copy of the Demand.

13. Following this, and through the course of several communications, on January 11, 2023, counsel for the Board informed Plaintiff's counsel that:

> A Demand Review Committee was established last fall, but any substantive inquiry into the allegations in the demand has been deferred pending resolution of the motion to dismiss in the securities class action (where Defendants' motion for reconsideration is currently pending).

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

14.    Attached hereto as **Exhibit B** is a true and correct copy of the counsel for the Board's response.

15.    The above referenced Motion to Dismiss in the related securities class action was denied on September 27, 2022 and Defendants' Motion for Reconsideration was also denied on February 2, 2023.  Despite this, the Board has not taken any further action on behalf of the Company, thus constituting a refusal of the Demand.

16.    The Board's refusal to commence a civil action for an undetermined amount of time, if at all, is an improper and wrongful refusal of the Demand. Thus, Plaintiff rightfully brings this action in the right and for the benefit of Acadia to recover for the damages caused to the Company by Defendants.   As such, this derivative action should be permitted to proceed.

### JURISDICTION AND VENUE

17.    This Court also has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 as the claims asserted herein arise under Sections 10(b), 21D, and 14(a) of the Securities Exchange Act of 1934 ("Exchange Act").

18.    This Court also has jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

19.    Venue is proper in this Court in accordance with 28 U.S.C. § 1391 because: (i) the Company maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein and aiding and abetting and conspiracy in violation of fiduciary duties owed to the Company, occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

20.     In connection with the acts, transactions, and conduct alleged herein, the Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

**Plaintiff**

21.     ***Plaintiff Ella Kanner*** ("Plaintiff Kanner") is a current Acadia shareholder during the relevant period.  Plaintiff Kanner purchased shares of Acadia stock on February 1, 2021.  Plaintiff Kanner will continue to hold Acadia shares throughout the pendency of this action.  Plaintiff Kanner will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.

**Nominal Defendant**

22.     Nominal Defendant Acadia is a Delaware corporation with principal executive offices located at 12830 El Camino Real, Suite 400, San Diego, California 92130.  The Company's common stock trades in an efficient market on the Nasdaq Global Select Market ("NASDAQ") under the ticker symbol "ACAD."

**Director Defendants**

23.     ***Defendant Julian C. Baker*** ("Baker") has served as a director of the Company since December 2015. Defendant Baker is a member of the Compensation Committee.  During the Relevant Period, Defendant Baker received $1,047,393 total compensation from the Company in connection with his role as director.

24.     ***Defendant Stephen R. Biggar, M.D., Ph.D.*** ("Biggar") has served as a director of the Company since January 2013.  Defendant Biggar is the Chair of the Compensation Committee and a member of the Nominating and Corporate Governance Committee.  During the Relevant Period, Defendant Biggar received

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

$1,192,393 total compensation from the Company in connection with his role as director.

25.   **Defendant Daniel B. Soland** ("Soland") has served as a director of the Company since March 2015.   Defendant Soland is the Chair of the Nominating and Corporate Governance Committee and a member of the Audit Committee. During the Relevant Period, Defendant Soland received $1,184,873 total compensation from the Company in connection with his role as director.

26.   **Defendant Laura A. Brege** ("Brege") has served as a director of the Company since May 2008.  Defendant Brege is the Chair of the Audit Committee and a member of the Nominating and Corporate Governance Committee. During the Relevant Period, Defendant Brege received $1,092,393 total compensation from the Company in connection with her role as director.

27.   **Defendant Stephen R. Davis** ("Davis") has served as the Chief Executive Officer ("CEO") and as a director of the Company since September 2015. Defendant Davis joined Acadia in 2014 as Executive Vice President, Chief Financial Officer. Defendant Davis, during the Relevant Period, received over $25.1 million total compensation from the Company.  Moreover, Defendant Davis was an architect and primary beneficiary of the scheme alleged herein as he made numerous false and misleading statements throughout the Relevant Period and sold ***$24.8 million in stock at artificially inflated prices***. As a result of his misconduct, Defendant Davis is also a named defendant in the related securities class action.

28.   **Defendant Elizabeth A. Garofalo, M.D.** ("Garofalo") has served as a director of the Company since September 2020.  During the just two years of the Relevant Period, Defendant Garofalo received $730,056 total compensation from the Company in connection with her role as director.

29.   **Defendant James M. Daly** ("Daly") has served as a director of the Company since January 2016.   Defendant Daly is a member of the Audit

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  Committee and Compensation Committee. During the Relevant Period, Defendant
2  Daly received $1,184,873 total compensation from the Company in connection
3  with his role as director.  Moreover, during the Relevant Period, Defendant Daly
4  sold Acadia stock at artificially inflated prices for proceeds of over $1.3 million.

5      30.   **Defendant Edmund P. Harrigan, M.D.** ("Harrigan") has served as a
6  director of the Company since November 2015. During the Relevant Period,
7  Defendant Harrigan received $1,144,873 total compensation from the Company in
8  connection with his role as director.

9      31.   The above-named defendants at ¶¶ 23–30 are referred to herein as
10  the "Director Defendants."

11  **Officer Defendants**

12      32.   **Defendant Srdjan (Serge) R. Stankovic** ("Stankovic") has served as
13  Acadia's President and Head of Research and Development since November
14  2018. Prior to serving as President, Defendant Stankovic was Acadia's Executive
15  Vice President, Head of Research and Development from November 2015
16  through November 2018.  During the Relevant Period, Defendant Stankovic
17  received over $14.8 million total compensation from the Company.  Defendant
18  Stankovic was an architect and primary beneficiary of the scheme alleged herein
19  as he made numerous false and misleading statements throughout the Relevant
20  Period and sold $18.9 million in stock at artificially inflated prices. Additionally,
21  as the Head of Research and Development, Defendant Stankovic was aware that
22  the FDA had never agreed to Acadia's plan for the sNDA.  Defendant Stankovic
23  was also aware of the defects in the Harmony Study and the problematic data
24  generated by the study.  As a result of his misconduct, Defendant Stankovic is also
25  a named defendant in the related securities class action.

26      33.   The above-named Director Defendants along with Defendant
27  Stankovic are referred to herein as the "Defendants."

28                    **FIDUCIARY DUTIES OF THE DEFENDANTS**

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

34.     By reason of their positions as officers, directors, and/or fiduciaries of the Company and because of their ability to control the business and corporate affairs of the Company, Defendants owed the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.  Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally, and not in furtherance of their personal interest or benefit.

35.     Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, as well as the highest obligations of fair dealing.  In addition, as officers and/or directors of a publicly held company, Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, finances, financial condition, and present and future business prospects so that the market price of the Company's stock would be based on truthful and accurate information.

36.     Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.  Because of their advisory, executive, managerial and directorial positions with the Company, each of the Defendants had access to adverse non-public information about the financial condition, operations, sales and marketing practices, and improper representations of the Company.

37.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of the Company were required to, among other things:

(a)   ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

(b)   conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)   properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)   remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

(e)   ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable federal, state and local laws, rules and regulations;

38.   Each Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of Defendants

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that Defendants were aware or should have been aware posed a risk of serious injury to the Company.

39.   Each director and officer of the Company owed to the Company the fiduciary duty to exercise due care and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of good faith and fair dealing.

40.   Defendants breached their duties of loyalty and good faith by causing the Company to misrepresent the information as detailed *infra*.   Defendants subjected the Company to the costs of defending and the potential liability from a class action lawsuit for violations of the federal securities laws.   As a result, the Company has expended, and will continue to expend, significant sums of money.

41.   Defendants' actions have irreparably damaged the Company's corporate image and goodwill.

## ADDITIONAL DUTIES OF THE DEFENDANTS

### Code of Conduct

42.   At all relevant times, the Company had in place its Code of Business Conduct and Ethics ("Code of Conduct") which covers employees, directors, and officers (collectively referenced to in the Code of Conduct as "employees"). The Code of Conduct states that the Company is "committed to maintaining the highest standards of business conduct and ethics. This [Code of Conduct] reflects the business practices and principles of behavior that support this commitment."

43.   The Code of Conduct further states that "[o]fficers and managers are expected to develop in employees a sense of commitment to the spirit a well as the letter of this [Code of Conduct]" and that "[v]iolations of this [Code of Conduct] will not be tolerated."

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

44.     The Code of Conduct states, in relevant part:

**1. Honest and Ethical Conduct**

It is the policy of the Company to promote high standards of integrity by conducting our affairs in an honest and ethical manner. The integrity and reputation of the Company depends on the honesty, fairness and integrity brought to the job by each person associated with us. Unyielding personal integrity is the foundation of corporate integrity.

**2. Legal Compliance**

Obeying the law, both in letter and in spirit, is the foundation of this Code. Our success depends upon each employee operating within legal guidelines and cooperating with local, national and international authorities. We expect employees to understand the legal and regulatory requirements applicable to their business units and areas of responsibility. We hold periodic training sessions to ensure that all employees are aware of and comply with the relevant laws, rules and regulations associated with their employment, including laws prohibiting insider trading (which are discussed in further detail in Section 3 below). While we do not expect you to memorize every detail of these laws, rules and regulations, we want you to be able to determine when to seek advice from others. If you do have a question in the area of legal compliance, it is important that you not hesitate to seek answers from your manager or the Chief Compliance Officer (as provided in Section 16). Disregard of the law will not be tolerated. Violation of domestic or foreign laws, rules and regulations may subject an individual, as well as the Company, to civil and/or criminal penalties. You should be aware that conduct and records, including e-mails, are subject to internal and external audits, and to discovery by third parties in the event of a government investigation or civil litigation. It is in everyone's best interests to know and comply with our legal obligations.

**3. Insider Trading**

Employees who have access to confidential or "inside" information are not permitted to use or share that information for stock trading purposes or for any other purpose except to conduct our business. All non-public information about the Company or about companies with which we do business is considered confidential information. To use

11

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

material non-public information in connection with buying or selling securities, including "tipping" others who might make an investment decision on the basis of this information, is not only unethical but also illegal. Employees must exercise the utmost care when handling material inside information and must adhere to the Company's Policy Against Trading on the Basis of Inside Information.

\*     \*     \*

### 9. Maintenance of Corporate Books, Records, Documents and Accounts; Financial Integrity; Public Reporting

The integrity of our records and public disclosure depends upon the validity, accuracy and completeness of the information supporting the entries to our books of account. Therefore, our corporate and business records should be completed accurately and honestly. The making of false or misleading entries, whether they relate to financial results or test results, is strictly prohibited. Our records serve as a basis for managing our business and are important in meeting our obligations to customers, suppliers, creditors, employees, stockholders and others with whom we do business. As a result, it is important that our books, records and accounts accurately and fairly reflect, in reasonable detail, our assets, liabilities, revenues, costs and expenses, as well as all transactions and changes in assets and liabilities.

### Audit Committee Charter

45.    Pursuant to the Company's Audit Committee Charter, the purpose of the Audit Committee is to assist the Board with oversight responsibilities with respect to: (i) the Company's corporate accounting, financial reporting processes, systems of internal accounting and financial controls, and audits of financial statements; (ii) the Company's legal and ethical compliance; and (iii) the Company's press releases.

46.    In particular, the Audit Committee Charter states:

**B.    Oversee Internal Controls and Risk Management**

*1.    Complaint Procedures.* Establish procedures, when and as required by applicable laws, rules and regulations, for

12

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

the receipt, retention and treatment of complaints received by
the Company regarding accounting, internal accounting
controls or auditing matters and the confidential and
anonymous submission by employees of concerns regarding
questionable accounting or auditing matters. Review such
procedures as necessary from time to time.

**2.      *Internal Control Over Financial Reporting.*** Discuss
with management and the Auditors the scope, adequacy and
effectiveness of the Company's internal control over financial
reporting.

**3.      *Financial Risk Assessment and Management.*** Review
and discuss with management the Company's major financial
risk exposures and the steps taken by management to monitor
and control these exposures, including reviewing and/or
implementing any guidelines and policies with respect to
financial risk assessment and management adopted by the
Company.

*      *      *

**C.      Oversee Financial Reporting**

[…]

**3.      *Management's Discussion and Analysis.*** Review and
discuss with management and the Auditors, as appropriate, the
Company's disclosures contained under the caption
"Management's Discussion and Analysis of Financial
Condition and Results of Operations" in its periodic reports to
be filed with the Securities and Exchange Commission (the
"SEC").

[…]

**6.      *Press Releases.*** Review and discuss with management
and the Auditors, as appropriate, earnings press releases, as
well as financial information and earnings guidance, which
discussions may be general discussions of the type of
information to be disclosed or the type of presentation to be

made. The chairperson of the Committee may represent the entire Committee for purposes of this discussion.

## D.     Oversee Legal and Ethical Compliance

***1. Related Person Transactions.*** Review and approve every transaction with a related person that must be disclosed by the Company pursuant to Item 404(a) of SEC Regulation S-K. 6.

## E.     Report and Self-Evaluate

***1.     Proxy Report.*** Prepare the report required by the rules of the SEC to be included in the Company's annual proxy statement.

***2.     Report to Board.*** From time to time or whenever it shall be called upon to do so, report to the full Board with respect to the Company's financial statements, the performance and independence of the Company's Auditors and such other matters as the Committee deems appropriate.

***3.     Annual Committee Evaluation.*** Conduct an annual evaluation of the performance of the Committee.

***4.     Annual Charter Review.*** Review and assess the adequacy of this Charter annually and recommend any proposed changes to the Board for approval.

***5.     General Authority.*** Perform such other functions and exercise such powers as may be necessary or appropriate in the efficient and lawful discharge of the foregoing.

**Nominating and Corporate Governance Committee Charter**

47.     The Company's Nominating and Corporate Governance ("N&G") Committee Charter provides that the purpose of the N&G Committee is to, among other things, oversee all aspects of the Company's corporate governance functions on behalf of the Board.

48.     Specifically, the N&G Committee Charter sets forth the following responsibilities, in relevant part:

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**Board Assessment –** The Committee shall periodically review, discuss and assess the performance of the Board, including Board committees, seeking input from senior management, the full Board and others. The assessment shall include evaluation of the Board's contribution as a whole and effectiveness in serving the best interests of the Company and its stockholders, specific areas in which the Board and/or management believe contributions could be improved, and overall Board composition and makeup, including the reelection of current Board members. The factors to be considered shall include whether the directors, both individually and collectively, can and do provide the integrity, experience, judgment, commitment, skills and expertise appropriate for the Company. The Committee shall also consider and assess the independence of directors, including whether a majority of the Board continue to be independent from management in both fact and appearance, as well as within the meaning prescribed by NASDAQ. The results of these reviews shall be provided to the Board for further discussion as appropriate.

**Board Committees –** The Committee, after due consideration of the interests, independence and experience of the individual directors and the independence and experience requirements of NASDAQ, the rules and regulations of the Securities and Exchange Commission and applicable law, shall evaluate the performance of the members of the committees of the 3. Board, review the composition of such committees and recommend to the entire Board annually the chairmanship and membership of each such committee.

\*   \*   \*

**Corporate Governance Principles –** The Committee shall develop a set of corporate governance principles to be applicable to the Company, shall periodically review and assess these principles and their application, and shall recommend any changes deemed appropriate to the Board for its consideration. Further, the Committee shall periodically review Company policy statements to determine their adherence to the Company's Code of Business Conduct and Ethics (the "Code of Ethics") and consider any request made by a director or officer of the Company for a waiver of any provision of the Code of Ethics.

**Procedures for Information Dissemination –** The Committee shall oversee and review the processes and procedures used by the

15

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Company to provide information to the Board and its committees. The Committee should consider, among other factors, the reporting channels through which the Board and its committees receive information and the level of access to outside advisors where necessary or appropriate, as well as the procedures for providing accurate, relevant and appropriately detailed information to the Board and its committees on a timely basis.

## SUBSTANTIVE ALLEGATIONS

### Background

49.     Acadia is a biopharmaceutical company that focuses on the development and commercialization of small molecule drugs that address unmet medical needs in central nervous systems ("CNS") disorders.  The Company is developing pimavanserin as a treatment for dementia-related psychosis ("DRP") as an adjunctive treatment for schizophrenia, as well as an adjunctive treatment for major depressive disorder.  DRP occurs in patients with a various types of dementia, including Alzheimer's disease, dementia with Lewy bodies, vascular dementia, frontotemporal dementia, and Parkinson's disease dementia.

50.     Acadia's most valuable product is its novel drug, NUPLAZID (pimavanserin).  Pimavanserin is a selective serotonin inverse agonist, or SSIA, preferentially targeting 5-HT2A receptors. Acadia owns the worldwide commercialization rights to pimavanserin.

51.     In April 2016, the FDA approved pimavanserin for the treatment of hallucinations and delusions associated with Parkinson's disease psychosis ("PDP").

52.     The PDP approval has been a very successful source of income for the Company as the Company's net sales consist of pimavanserin sales only.  In 2020, the Company had net product sales of $441.8 million, representing a 30% year-over-year growth.

53.     Since 2017, the Company has been actively working on expanding pimavanserin's label to encompass all DRP. In October 2017, the Company

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

announced that the FDA had granted Breakthrough Therapy Designation to pimavanserin for the treatment of DRP.

54.     Expanding the label would be of significant commercial value to Acadia.  Analysts saw U.S. peak sales increasing to $2.4 billion in DRP (including PDP) if the label was expanded to include a broad indication for DRP.

55.     On June 3, 2020, the Company submitted its sNDA for pimavanserin for the treatment of hallucinations and delusions associated with DRP.  The sNDA was based on three studies described herein: principally, the Harmony Study; with further support from the Phase III "-020 Study," and the Phase II "-019 Study."

*The -020 Study*

56.     The -020 Study was initiated in July 2011 and evaluated the efficacy, tolerability, and safety of pimavanserin in patients with PDP.  A total of 199 patients were enrolled in the study and randomized on a one-to-one basis to receive either 40mg of pimavanserin or a placebo once-daily for six weeks, following a two-week screening period including brief psycho-social therapy. Patients also received stable doses of their existing anti-Parkinson's therapy throughout the study. The -020 Study was a multi-center, double-blind, placebo-controlled study, with 62 locations in the U.S. and 1 in Canada.  The mean age of patients in the -020 study was 72.

57.     In November 2012, the Company announced positive top-line results for the -020 Study.  Pimavanserin met the primary endpoint in the -020 Study by demonstrating highly significant antipsychotic efficacy.  Pimavanserin also met the secondary endpoint for motoric tolerability. These results were supported by a highly significant improvement in the secondary measure of antipsychotic efficacy. Additionally, clinical benefits were observed in exploratory efficacy measures of sleep and caregiver burden. Consistent with previous studies, pimavanserin was generally safe and well tolerated in the -020 Study.  The -020

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Study was the primary basis for the FDA's 2016 approval of pimavanserin for the treatment of PDP.

***The -019 Study***

58.     Initiated in November 2013, the -019 Study enrolled 181 patients and was conducted at a single site – a network of 134 care homes in London, United Kingdom.  The -019 Study was a double-blind, placebo-controlled exploratory trial designed to evaluate the efficacy and safety of pimavanserin as a treatment for patients with Alzheimer's disease psychosis ("ADP"). Following a screening period, patients were randomized on a one-to-one basis to receive either pimavanserin or a placebo once-daily. The primary endpoint of the study was antipsychotic efficacy from baseline to week six of dosing. The study also assessed additional secondary endpoints, including the cognitive status of patients and the durability of response to pimavanserin, through week twelve of dosing.

59.     In December 2016, the Company announced positive top-line results from the -019 Study.  Pimavanserin demonstrated efficacy on its primary endpoint with a 3.76 point improvement in psychosis at week six compared to a 1.93 point improvement for placebo, representing a statistically significant treatment improvement.  Pimavanserin was generally well tolerated, and the safety profile was consistent with what had been observed in previous studies.  Over the course of twelve weeks of treatment, pimavanserin did not impair cognition as measured by the Mini-Mental State Examination ("MMSE"). On the secondary endpoint of mean change at week twelve, pimavanserin maintained the improvement on psychosis observed at the week six endpoint but did not statistically separate from the placebo. The mean age of the patients in the -019 Study was 86.

60.     Following the -019 Study, in mid-2017, Acadia had an End-of-Phase II meeting with the FDA. During this meeting, and according to the Company, Acadia proposed a plan for a single Phase III study that would support approval not for an indication of pimavanserin for ADP, but for a broader indication of

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

pimavanserin for DRP. A driver of this decision to seek approval for DRP over ADP (which was the focus of the -019 Study) was the fact that the Company had more competition in the ADP treatment space.

***The Harmony Study***

61.   Following this, in October 2017, the Company initiated the Harmony Study, a pivotal Phase III study which would assess pimavanserin as a treatment for DRP – a far broader indication than the already FDA-approved PDP indication and ADP indication sought in the -019 Study.

62.   The Harmony Study was a double-blind, placebo-controlled relapse prevention study. It followed patients until they had a relapse (defined as hospitalization as a result of DRP), deterioration of dementia symptoms, withdrawal from the study due to lack of efficacy, or use of another antipsychotic medication.

63.   The Harmony Study took place at 83 study locations, across the U.S., Europe, and Chile, and enrolled 392 participants with dementia who had suffered from symptoms of psychosis for at least the previous two months. Following a twelve-week open-label period, participants who responded were broken into two groups for the following twenty-six weeks, in which one received a placebo and the other received pimavanserin.

64.   Acadia, along with Defendants Davis and Stankovic, possessed data from the Harmony Study starting in at least September 2019. The primary completion date of the Harmony Study – the date on which the last participant in the study was examined to collect final data for the primary outcome measure – was July 31, 2019.

65.   On September 9, 2019, the Company issued a press release entitled "ACADIA Pharmaceuticals Announces Pivotal Phase 3 HARMONY Trial Stopped Early for Positive Efficacy as Pimavanserin Meets the Primary Endpoint in Patients with Dementia-Related Psychosis" in which Defendants claimed that

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

the Harmony Study was stopped early due to positive efficacy at the pre-planned interim analysis.

## FALSE AND MISLEADING STATEMENTS

66.     On September 9, 2019, Acadia issued a press release stating:

ACADIA Pharmaceuticals (Nasdaq: ACAD) today announced that its Phase 3 HARMONY study, a double-blind, placebo-controlled relapse prevention trial evaluating pimavanserin for the treatment of dementia-related psychosis, met its primary endpoint, demonstrating a highly statistically significant longer time to relapse of psychosis with pimavanserin compared to placebo in a planned interim efficacy analysis.

\*      \*      \*

The Company is planning to meet with the FDA regarding a supplemental NDA submission in 2020 and the results from the HARMONY study will be submitted for a presentation at upcoming medical meetings.

\*      \*      \*

"We are very excited that today's results bring us one step closer to the potential of offering patients with dementia-related psychosis a critically needed treatment option," said Serge Stankovic, M.D., M.S.P.H., ACADIA's President. "We look forward to speaking with the FDA about a supplemental new drug application to support pimavanserin for the treatment of dementia-related psychosis. I want to thank all of the patients, their families, and the investigators for their participation in this important study."

67.     That same day, the Company held a conference call to discuss the Harmony Study results.  During this call, Defendant Stankovic represented that:

As Steve mentioned, pimavanserin was previously granted Breakthrough Therapy Designation for dementia-related psychosis. This was based on the seriousness of the disease with unmet need and the clinical results we have already observed, including our positive Alzheimer's disease psychosis study, which showed statistically significant reduction in psychotic symptoms in patients with Alzheimer's disease versus placebo without a negative impact on measure of cognitive function. And our positive Phase III pivotal study showing improvement in severity and frequency of hallucinations and delusions in patients with Parkinson's disease

20

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

psychosis. This study included a prespecified subgroup analysis of dementia patients who, when treated with pimavanserin, also showed a statistically significant improvement in psychosis compared to placebo.

***I would also like to remind you that at the end of Phase II meeting with FDA, we confirmed that for our supplemental NDA submission in DRP, we could rely on a single, well-controlled study whose results were both statistically and clinically very persuasive.***

In addition to the pivotal HARMONY study, we plan to submit in the supplemental NDA positive data in patients with dementia from the 2 previous efficacy studies as well as additional safety data from our ongoing placebo-controlled post-marketing commitment safety study of pimavanserin in elderly frail patients with neuropsychiatric symptoms related to neurodegenerative disease. [Emphasis added].

68.     The foregoing statements were materially false and misleading because they failed to disclose that, due to a very small sample size of patients in each subgroup, the Harmony Study could not effectively determine whether pimavanserin was an effective treatment for the different groups. Therefore, undisclosed by Defendants, FDA approval was extremely unlikely unless the results from the Harmony Study were very strong.  However, the data was disappointing, particularly as to the non-Parkinson's patients, indicating that the likelihood of FDA approval was very low. Moreover, the assertion that the FDA had blessed the Company's approach to the sNDA was false and misleading because no such agreement was reached.

69.     On October 30, 2019, the Company held an earnings call to discuss the Company's financial results for the third quarter of 2019. During this, the following exchange occurred between an analyst and Defendants Davis and Stankovic:

**Tazeen Ahmad – BofA Merrill Lynch, Research Division – VP**

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

This is either for Serge or for Steve. We're looking forward to seeing your data set presented at CTAD on the 4th of December. And head of that, I'm just wondering if you could give us an idea, of what additional details from the study you plan on showing? So should we expect to see a breakout of the different subsets of patients that were studied as part of the DRP indication? And I guess related to that, is your expectation that you would get a label just simply saying DRP? Or would it be specific to maybe the subgroups that seem to be most responsive, if there were subgroups that were more responsive than others?

**Stephen R. Davis – ACADIA Pharmaceuticals Inc. – CEO & Director**

Great. Thanks for the question, Tazeen. It's a 2-part question, Serge, and we're going to let you take both of them.

**Srdjan R. Stankovic – ACADIA Pharmaceuticals Inc. – President**

Yes, sure. Let me first tackle the – what data we will plan to present at CTAD. We will be sharing all material top line results from the study, meaning efficacy data from the open-label portion of the trial, primary and key secondary endpoint details in the trial, particularly obviously, in the randomized withdrawal portion, as well as overall safety data. So as part of that to – specifically to your question, we will be presenting the data related to different subtypes of dementia as well.

To your second question, all discussions that we had with the FDA and our initial intention were related to us pursuing indication of the treatment of hallucinations and delusions in dementia-related psychosis. So yes, indeed, that is what we are pursuing, and that is what we had discussed with the FDA.

70.    The foregoing statement by Defendant Stankovic was materially false and misleading because the assertion that the FDA agreed with the Company's approach was false.  Further, Defendant Stankovic misleadingly failed to disclose that known shortcomings in the studies submitted with the sNDA, including the disappointing data, posed major obstacles to FDA approval.

22

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

71.     On February 26, 2020, the Company held an earnings call to discuss the Company's financial results for the fourth quarter and full year 2019.  During the earnings call, the following exchange occurred between analysts and Defendant Stankovic:

> **Ritu Subhalaksmi Baral – Cowen and Company, LLC, Research Division – MD & Senior Biotechnology Analyst**
>
> And so you've generated all the safety data and safety analysis used for that NDA, sNDA sorry?
>
> **Srdjan R. Stankovic – ACADIA Pharmaceuticals Inc. – President**
>
> Yes, we generated all the -- both efficacy and safety data that we will be submitting with that supplemental NDA.
>
> *       *       *
>
> **Alexander Thompson – Stifel, Nicolaus & Company, Incorporated, Research Division – Research Analyst**
>
> This is Alex on for Paul. Just a quick question on your upcoming sNDA meeting.  Just wondering if you could sort of give us a sense of what your goals are for the meeting, what you expect to discuss with the FDA just generally and if you'll provide us with an update once that occurred?  Great. Thank you.
>
> **Srdjan R. Stankovic – ACADIA Pharmaceuticals Inc. – President**
>
> […] As I mentioned earlier, we're meeting with FDA primarily to review the content and format of our application, meaning, we will be discussing with them the totality of the data we are bringing both efficacy and safety data. We're bringing to the sNDA as well as the different ways of analyses and pooling of the data in order to present better and enable reviewers to do their review both on the efficacy and the safety side. So discussing that content and the format of that data presentation is our main objectives in the discussion with FDA.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

72.     The foregoing statements made by Defendant Stankovic were materially false and misleading because Defendant Stankovic – and Defendant Davis who was also on the call – failed to disclose that the known shortcomings in the studies submitted with the sNDA, including the disappointing data, posed major obstacles to FDA approval.

73.     On May 7, 2020, the Company held an earnings call to discuss the Company's financial results for the first quarter of 2020.   During the call, Defendant Stankovic said:

> As planned, we successfully completed a pre-sNDA meeting with the FDA and confirm that *the pivotal data from our HARMONY study, together with the confirmatory and supportive results from our Alzheimer's disease psychosis Phase II study and our Parkinson's disease psychosis Phase III study will all support the submission of an sNDA for pimavanserin in dementia-related psychosis*. In addition, we discussed the overall safety database and analysis plan. Our sNDA preparation remains firmly on track. As previously announced, we plan to submit the sNDA this summer. We expect a priority review with a potential approval for DRP around year-end.  [Emphasis added].

74.     The foregoing statement was materially false and misleading because Defendants failed to disclose that the known shortcomings in the studies submitted with the sNDA, including the disappointing data, posed major obstacles to FDA approval.

75.     On April 29, 2020, the Company filed with the SEC a proxy statement via Schedule 14A (the "2020 Proxy Statement"), which was solicited by Defendants Biggar, Baker, Brege, Daly, Harrigan, Soland, Davis, and Stankovic. The 2020 Proxy Statement solicited shareholders to, *inter alia*: (i) re-elect Defendants Daly and Harrigan to the Board; (ii) approve an amendment to the Company's Employee Stock Purchase Plan to increase the aggregate number of shares authorized for issuance; (iii) approve the director compensation policy; and

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

(iv) approve the executive officer's compensation. The 2020 Proxy Statement also contained the following information:

**_Company Performance in 2019_**

2019 was a year of strong growth for the Company. Several significant commercial goals were achieved, leading to a 52% increase in net sales over 2018 of NUPLAZID. Additional key objectives were achieved during the year, including:

[] Enrollment targets were exceeded in clinical trials for dementia-related psychosis (DRP) [...];

[] Positive results were achieved in pivotal studies for DRP and the negative symptoms of schizophrenia;

[...]

76.    The 2020 Proxy Statement failed to disclose that known shortcomings in the studies submitted with the sNDA, including the disappointing data, posed major obstacles to FDA approval.  Had the shareholders known these facts, then they would not have approved the above solicited proposals.

77.    On May 12, 2020, during the Bank of America Merrill Lynch Healthcare Conference, the following exchange occurred between a research analyst and Defendant Davis:

**Tazeen Ahmad – BofA Merrill Lynch, Research Division – VP**

I think I was on mute. Okay.  Thanks for calling that out.  So maybe we can talk a little bit about DRP, Steve, as one of your next indications. Can you review what you discussed with the FDA perhaps at the pre-sNDA meeting?  Can you provide a little bit of expectations on timelines for submission and approval? I know you've talked about this in general and whether or not you still expect to have an AdCom, if you believe that there will be any kind of modifications of the current box warning?

**Stephen R. Davis – ACADIA Pharmaceuticals Inc. – CEO & Director**

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Yes, absolutely.  So as I mentioned, we had our pre-sNDA meeting in the first quarter. ***The feedback there was very consistent with what we heard with our end-of-Phase II meeting. The FDA confirmed that the studies conducted can support an sNDA submission with HARMONY as the pivotal study, and our Phase II Alzheimer's disease study and Phase III Parkinson's disease psychosis study as supportive efficacy studies***.  [Emphasis added].

78.    The foregoing statement by Defendant Davis was materially false and misleading because Defendants failed to disclosure that the known shortcomings in the studies submitted with the sNDA, including the disappointing data, posed major obstacles to FDA approval.  Moreover, the assertion that the FDA had "confirmed" that Acadia's approach could support the sNDA was false and misleading.

79.    On June 15, 2020, Acadia issued a press release announcing the submission of the pimavanserin sNDA, stating, in relevant part:

SAN DIEGO – (BUSINESS WIRE) – ACADIA Pharmaceuticals Inc. (Nasdaq: ACAD) announced today that the company submitted a [sNDA] to the [FDA] to support a potential new indication for NUPLAZID® (pimavanserin) for the treatment of hallucinations and delusions associated with dementia-related psychosis (DRP). The FDA previously granted Breakthrough Therapy Designation for pimavanserin for the treatment of hallucinations and delusions associated with DRP.

"This is an important step forward for the approximately 2.4 million people in the U.S. who suffer from dementia-related hallucinations and delusions, representing a large unmet need with currently no approved treatment options," said Steve Davis, ACADIA's Chief Executive Officer. "Our pivotal HARMONY study showed a meaningful reduction of the symptoms and stabilization of psychosis and a nearly three-fold reduction in the risk of relapse of psychosis for patients continuing treatment on pimavanserin compared to placebo. We look forward to working with the FDA as it reviews our submission."

The sNDA is supported by results from the pivotal Phase 3 HARMONY study, which met its primary endpoint, demonstrating

26

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

that pimavanserin significantly reduced the risk of relapse of psychosis by 2.8 fold compared to placebo (hazard ratio = 0.353; one-sided p=0.0023). The sNDA also includes positive efficacy results from two additional placebo-controlled studies, both of which met their respective primary endpoints: The Phase 2 (-019) study in patients with Alzheimer's disease psychosis and the Phase 3 (-020) study in patients with Parkinson's disease psychosis. The sNDA includes a large safety and tolerability database from completed and ongoing studies representing over 1500 patients with neurodegenerative disease.

80.     The foregoing statements contained in the Company's press release was materially false and misleading because Defendants failed to disclose that the known shortcomings in the studies submitted with the sNDA, including the disappointing data, posed major obstacles to FDA approval.

81.     On July 20, 2020, Acadia issued a press release announcing that the FDA had accepted the pimavanserin sNDA for filing. The press release stated, in relevant part:

"We are pleased that the FDA has accepted our sNDA for filing and we will be working closely with the FDA to facilitate completion of the review in a timely manner," said Steve Davis, ACADIA's Chief Executive Officer. "If approved, NUPLAZID would be the first therapy indicated for the treatment of hallucinations and delusions associated with dementia-related psychosis. We look forward to potentially bringing this important treatment advancement to patients, caregivers and physicians."

82.     The foregoing statements contained in the Company's press release was materially false and misleading because Defendants failed to disclose that the known shortcomings in the studies submitted with the sNDA, including the disappointing data, posed major obstacles to FDA approval.

83.     On August 5, 2020, Acadia issued a press release announcing the Company's second quarter 2020 financial results. The press release stated, in relevant part:

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

"In the first half of 2020 we drove robust growth of NUPLAZID®. With the FDA filing of our sNDA for dementia-related psychosis we are one step closer to potentially delivering the first and only approved treatment for this devastating condition," said Steve Davis, ACADIA's Chief Executive Officer. "Building upon the successful development of our PDP and DRP programs, our clinical team is focused on advancing our innovative early- and late-stage pipeline.

84.   That same day, Acadia hosted an earnings call with investors and analysts to discuss the Company's second quarter 2020 results.  During the call, Defendant Davis stated, in relevant part:

We've made important and significant progress on our 3 strategic pillars. As a reminder, this year, we are focused on driving the growth of NUPLAZID for patients with Parkinson's disease psychosis; delivering on the dementia-related psychosis opportunity, our second indication for NUPLAZID; and developing innovative new treatments for unmet needs in CNS with 3 candidates in our early and late-stage development pipeline.

\*      \*      \*

Our supplemental NDA for dementia-related psychosis was accepted for filing by the FDA with the PDUFA date of April 3, 2021. The filing of the application is an important next step as DRP is a devastating and highly disruptive disease and represents a significant unmet need, not only for the patients but also for their caregivers and family members. We are highly confident in both the efficacy and safety data supporting our submission and look forward to continuing to work with the FDA to facilitate their review.

85.   Then, on August 6, 2020, Acadia filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended June 30, 2020 (the "2Q20 10-Q").  The 2Q20 10-Q touted the pimavanserin sNDA, stating:

[W]e believe dementia-related psychosis (DRP), represents one of our most important opportunities for further exploration. In June 2020, we submitted a [sNDA] for NUPLAZID for the treatment of hallucinations and delusions associated with DRP. In July 2020 the FDA notified us of acceptance of our sNDA with a PDUFA date of

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

April 3, 2021. The FDA advised us that it has not identified any potential review issues at this point in their evaluation and at this time they are not planning to hold an Advisory Committee meeting. The sNDA is supported by results from the pivotal Phase 3 HARMONY study, which met its primary endpoint, demonstrating that pimavanserin significantly reduced the risk of relapse of psychosis by 2.8 fold compared to placebo (hazard ratio = 0.353; one-sided p=0.0023). The sNDA also includes positive efficacy results from two additional placebo-controlled studies, both of which met their respective primary endpoints: the Phase 2 (-019) study in patients with Alzheimer's disease psychosis and the Phase 3 (-020) study in patients with Parkinson's disease psychosis. The sNDA includes a large safety database from completed and ongoing studies representing over 1,500 patients with neurodegenerative disease. An estimated 8.0 million people in the United States are living with dementia, and studies suggest that approximately 30% of dementia patients, or 2.4 million people, have psychosis, commonly consisting of delusions and hallucinations. Approximately 1.2 million patients in the United States are currently treated for DRP and, of those treated, approximately two-thirds are treated with off-label anti-psychotics. In the fourth quarter of 2017, the FDA granted Breakthrough Therapy Designation for pimavanserin for the treatment of DRP.

86.   Appended to the 2Q20 10-Q as exhibits were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendant Davis, attesting that, "the information contained in [the 2Q20 10-Q] fairly presents, in all material respects, the financial condition of the Company at the end of the period covered by the Report and results of operations of the Company for the period covered by [the 2Q20 10-Q]."

87.   The foregoing statements made during the August 5th earnings call and contained in the 2Q20 10-Q were materially false and misleading because Defendants failed to disclose that the known shortcomings in the studies submitted with the sNDA, including the disappointing data, posed major obstacles to FDA approval.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

88.   On August 19, 2020, at the JMP Securities CNS Forum, the following exchange occurred between a research analyst and Defendant Davis:

**Stephen R. Davis – ACADIA Pharmaceuticals Inc. – CEO & Director**

I'll just – just to echo Michael's thoughts, one of the things we hear very consistently among KOLs, just physicians generally is the – and as we've said before, the "subtypes" of dementia are very difficult to diagnose. They overlap many times. And so it's a little bit of an artificial distinction to say someone has Alzheimer's, dementia with Lewy bodies or vascular dementia, et cetera.

And so – and one of the advantages, of course, pursuing dementia related psychosis broadly, which is just, as a reminder, we got a clear agreement from – with the FDA at our end of Phase II meeting, and we executed the plan that we agreed to with them. One of the advantage is it picks up what's referred to as dementia not otherwise specified, that's coded as not otherwise specified. And that's a big chunk of patients. And that – the fact that so many patients are not specified other than beyond just saying dementia, is again, a reflection of the fact that these categories are very difficult to diagnose. So as Michael mentioned, the good news is physicians understand that. They operate in that world. And with the indication that we are seeking, it won't matter. They won't have to try to make a determination, whether it's Alzheimer's or vascular dementia or something else.

**Jason Nicholas Butler – JMP Securities LLC, Research Division – MD, Director of Healthcare Research & Equity Research Analyst**

And that's a really good point. And so let me just ask one more question about the FDA there. You obviously have this very broad patient population under the DRP umbrella. How do you think about more broadly the label indication statement based on the Phase III trial design, specifically the relapse prevention relative to PDP, where you had an initiation kind of trial design?

**Stephen R. Davis – ACADIA Pharmaceuticals Inc. – CEO & Director**

30

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Yes. Well, let me take it in from 2 perspectives. Let me take it from a regulatory perspective and then from a medical perspective. From a regulatory perspective, I just want to remind everyone that the sNDA that we've submitted includes the HARMONY study, the relapse prevention study but also includes – or the kind of study that we did in Parkinson's disease psychosis. It includes acute – we'll call it acute data as well over a much shorter time frame and it showed positive results, both in an Alzheimer's population as well as our – of course, our Parkinson's disease psychosis population. So we have both in the submission.

More importantly, we agreed with the FDA on that approach at our end of Phase II meeting and agreed on the plan for Phase III, and then we've executed that plan. From a medical perspective, it's also important because physicians – and they think – again, when they think about dementia-related psychosis, they oftentimes just think about it more broadly speaking. As they think about a relapse prevention study, what we hear over and over is it really resonates with them.

Many times in neuropsychiatry, when you get approval on a drug, it's based upon – we ran 1 arm with drug, 1 arm with placebo. We measured them on – we measured progress on the scale. We compared those 2 and have indication of efficacy. But physicians don't do that in practice. They don't use those scales, and they're really just looking at the clinical manifestation of the disease in the patient that they're seeing in the examining room on. And they're thinking about things like will this impact their symptoms, and if so, will it have a durability of effect. So the relapse prevention study really resonates with the medical community because it aligns with a clinical outcome and the kinds of things that they think about.

89.  The foregoing statements were materially false and misleading because Defendants failed to disclose that the known shortcomings in the studies submitted with the sNDA, including the disappointing data, posed major obstacles to FDA approval.  Further, the representation that the FDA had "agreed" with Acadia and that Acadia had "executed" an agreed to "plan" was false.  The FDA's

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

actions in rejecting Acadia's sNDA are inconsistent with any purported agreement with Acadia.

90.     On September 14, 2020, during a healthcare conference, the following exchange took place:

**Jeff Hung – Morgan Stanley, Research Division – Equity Analyst**

And what is your view on the recent string of complete response letters? Is there any reason to believe that there are any changes at the agency that might add risk to approval in DRP?

**Srdjan R. Stankovic – ACADIA Pharmaceuticals Inc. – President**

Well, I would say that we generally avoid to comment on other applications because we are not familiar with the details of the review or details of the data and all that. We do not see – each situation is different, and we do not se any particular policy arising from that attitude from these decisions, the different decision made. It may have to do with the timing, with resources, ability to complete those things and asking for additional data. *We continue to be very confident, as I said, in our data. It's very consistent with what we've been finding as we have been adding the new information, both in terms of efficacy and safety. We have a strong package and are currently focusing on facilitating review toward approval.* [Emphasis added].

*        *        *

**Jeff Hung – Morgan Stanley, Research Division – Equity Analyst**

Okay. And then multiple neurodegenerative disorders have patients with dementia-related psychosis, such as Alzheimer's. Which disorders do you think are more likely to have faster adoption? Do you think there will be certain ones that contribute more early on in the launch? And then, I guess, on the other hand, what kinds of things do you need to work on for the disorders that may not ramp up as quickly or early on in the launch such as patient or physician education?

**Stephen R. Davis – ACADIA Pharmaceuticals Inc. – CEO & Director**

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1

2   Yes. Let me take just a little bit of running start at it. So in
dementia-related psychosis, sometimes people think about various
3   subtypes. And of course, we've talked about that as well. But just
one, just as a background reminder that we received agreement
4   with the FDA that we would pursue dementia-related psychosis
broadly in order to treat the symptoms of psychosis, regardless of
5   their clinically diagnosed subtype. And I just want to be clear here,
that subtype diagnosis is very subjective. It's difficult to diagnose.
6   Many times, physicians don't know what the underlying etiology is
as you sometimes going to only find it out through autopsy.
7

8

9       91.     The foregoing statements made by Defendants Davis and Stankovic

10   were materially false and misleading because Defendants failed to disclose that,

11   due to a very small sample size of patients in each subgroup, the Harmony Study

12   could not effectively determine whether pimavanserin was an effective treatment

13   for the different subgroups.  Therefore, undisclosed by Defendants, FDA approval

14   was extremely unlikely unless the results from the Harmony Study were very

15   strong. However, the data was disappointing, particularly as to the non-

16   Parkinson's patients, indicating that the likelihood of approval was very low.

17   Moreover, the assertion that the FDA had blessed Acadia's approach to the sNDA

18   was false because no such agreement was reached.

19       92.     On November 4, 2020, Acadia filed a quarterly report on Form 10-Q

20   with the SEC, reporting the Company's financial and operating results for the

21   quarter ended September 30, 2020 (the "3Q20 10-Q"). The 3Q20 10-Q contained

22   substantively the same statements as referenced above, touting the pimavanserin

23   sNDA.

24       93.     Appended to the 3Q20 10-Q as exhibits were signed certifications

25   pursuant to SOX by Defendant Davis, attesting that, "the information contained in

26   [the 3Q20 10-Q] fairly presents, in all material respects, the financial condition of

27   the Company at the end of the period covered by the Report and results of

28   operations of the Company for the period covered by [the 3Q20 10-Q]."

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1
2
3

94.     Corresponding with the 3Q20 10-Q, Acadia issued a press release announcing the Company's third quarter 2020 financial results. The press release stated, in relevant part:

4
5
6
7
8
9
10

> This quarter we drove strong performance through the continued growth of new prescribers with more patients benefitting from NUPLAZID® treatment for their Parkinson's disease psychosis and remain on-track with our supplemental NDA for the treatment of dementia-related psychosis with a PDUFA date of April 3, 2021," said Steve Davis, Acadia's Chief Executive Officer. "We continue to advance our late-stage programs and invest in new opportunities through business development, highlighted by our recent acquisition of CerSci Therapeutics which expands our clinical pipeline with an innovative first-in-class, non-opioid, acute and chronic pain program.

11
12
13
14

95.     That same day, Acadia hosted an earnings call with investors and analysts to discuss the Company's third quarter 2020 results.  During the 3Q20 Earnings Call, Defendant Davis stated, in relevant part:

15
16
17

> We are well-prepared to achieve the long-term market opportunity for NUPLAZID in PDP and look forward to the addition of the DRP indication.

18

> *     *     *

19
20

> We are excited that pimavanserin could be the first and only FDA approved medicine for the treatment of Dementia-related psychosis.

21
22

> *     *     *

23
24
25
26
27
28

> We are confident in both the efficacy and safety data supporting our supplemental NDA and we will continue to work with the FDA to facilitate their review with a PDUFA date of April 3, 2021. We continue to make important progress in our late stage development pipeline as shown on slide eight, with but ongoing Phase 3 studies with pimavanserin for the treatment of negative symptoms of schizophrenia and with trofinetide for the treatment of Rett Syndrome.

96.     The foregoing statements made in the 3Q20 10-Q, press release, and earnings call were materially false and misleading because Defendants failed to disclose that, due to a very small sample size of patients in each subgroup, the Harmony Study could not effectively determine whether pimavanserin was an effective treatment for the different subgroups. Therefore, undisclosed by Defendants, FDA approval was extremely unlikely unless the results from the Harmony Study were very strong. However, the data was disappointing, particularly as to the non-Parkinson's patients, indicating that the likelihood of approval was very low.

97.     On November 17, 2020, during a healthcare conference, the following exchange took place between Defendant Davis and a Stifel, Nicholaus & Company analyst:

**Paul Andrew – Stifel, Nicholaus & Company, Incorporated, Research Division – Co-Head of the BioTech Team, MD & Senior Analyst**

I guess as you've had continued engagement with the FDA, is there any interpretation you have on the lack of priority review? Investors and analysts love to read these tea leaves. And I've been misled by priority review and no panel, resulting in a CRL. So I won't overdo it, but what did you think internally then? And how do you guys feel about the intent?

**Stephen R. Davis – ACADIA Pharmaceuticals Inc. – CEO & Director**

Yes. Thanks much for the question. ***So let me just start by saying we remain highly confident in both the efficacy and safety data supporting our submission***. And of course, at this point, we're focused on facilitating the FDA's review, which, as I mentioned, remains on track. And just as a brief reminder, ***our sNDA submission included an efficacy package, which was agreed upon with the FDA at the end of Phase II meetings before we conducted the pivotal HARMONY study***. And based upon the robust and meaningful results from HARMONY and the additional supporting data from other efficacy studies in Alzheimer's and

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Parkinson's patients, and then just the overall safety profile of pimavanserin, we remain very confident in the potential approval for DRP.

So again, just as I put it – with that backdrop, at our end of Phase II meeting, we went to the FDA. *We said we think we have demonstrated sufficient efficacy in acute setting. We'd like you to agree to 3 things: one, that we studied DRP generally. They agreed to that. That was actually a very short discussion*. Two, that we run a relapse-prevention study now to demonstrate the – not only that we can stabilize patient symptoms, but that we get a durable effect over time. And then three, that we – that a single relapse prevention study serve as the basis of approval, together with the other supporting acute studies we've done. *And they've agreed to all 3 of those*. That's documented in our minutes. So fast forward to today, we then executed the exact plan that we laid out for them. And again, that underlines the confidence we have in the potential for approval in DRP.  [Emphasis added].

**Paul Andrew – Stifel, Nicholaus & Company, Incorporated, Research Division – Co-Head of the BioTech Team, MD & Senior Analyst**

Got it. Okay. Great, Steve. What were your discussions with the FDA and what you need to show for safety? I mean, there's this whole – we had Alzheimer's panel here at this conference yesterday and one of the panelists walked through the whole back history, going back to the 2000s with atypicals in the elderly and the original black box and changes in policy and things like that. What did FDA – did they ever articulate to you what they wanted to see, right? It's obviously very hard to disprove a negative. And I guess, were they going to rely more on just your DRP clinical data? Or how much of the PDP post-marketing data goes into this?

**Stephen R. Davis – ACADIA Pharmaceuticals Inc. – CEO & Director**

Yes. They're both important. One thing that I didn't mention is that in the Phase II meeting we had setting up our Phase III program that we then executed, is in addition to those 3 points, we also just asked FDA very specifically. *We said we just want to make certain that you are on board with approving a drug to treat*

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

***dementia-related psychosis. Because today, there's a class warning for all antipsychotics, basically contraindicating that patient population. We want to make certain that you are on board with the concept of doing this if we followed the plan that we've agreed to.***

***And they said, absolutely, we wouldn't agree to your Phase III plan if we weren't in that – if we weren't of that mind.*** So again, fast forward to today, we've been on the market for 4 years. We've continued to run placebo controlled studies. If you look at the totality of the data that we have today on – just on safety, if anything, the safety profile and tolerability profile of the drug looks even better than it did when we got our PDP approval.

Most recently, or as a component of that PDP approval, we agreed to a post-marketing commitment to run a substantial number of patients in placebo-controlled study for elderly patients, evaluating them over – against placebo over a period of at least 8 weeks. And we – that commitment is due to be completed in the next year or 2. But any time you file an sNDA, you need to collect all the safety data that you've generated since your prior NDA approval. We've done that, including the most recent cut from that safety study. And like I said before, every cut of data that we've had continues to support, if not look even better than the original basis for approval in PDP. So we've submitted that data and that all looks very consistent with what we know about the drug.  [Emphasis added].

**Paul Andrew – Stifel, Nicholaus & Company, Incorporated, Research Division – Co-Head of the BioTech Team, MD & Senior Analyst**

Got it. That's great. All right. Last here of the regulatory question, I promise, because I don't want to belabor it. Between the PDUFA, Steve, are there any 3 like inflection points during the review from your seat that can be articulated and continue to convey comfort to investors?

**Stephen R. Davis – ACADIA Pharmaceuticals Inc. – CEO & Director**

We're following the same path that we did in the PDP review and that most companies do when they're in registration, that is, we're

37
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

not going to comment on the specific back and forth that we're having with FDA. I just don't think that will be productive. But what I will say is, we remain on track. We remain just as confident as we've ever been in the potential for approval and just eager to get to the PDUFA date.

98.     At the same conference, Defendant Davis had the following exchange with a JP Morgan Chase & Co analyst:

**Cory William Kasimov – JPMorgan Chase & Co, Research Division – Senior Biotechnology Analyst**

[…] obviously, everybody is really focused, as I'm sure you are, on your pending PDUFA date for NUPLAZID for DRP. Can you just kind of frame expectations for what you would maybe expect or hope a label would look like, and the importance that will play in the commercialization of the product for the indication?

**Stephen R. Davis – ACADIA Pharmaceuticals Inc. – CEO & Director**

Yes. Thanks much, Cory. I'll start and then – and Serge may want to add some additional color as well. So the indication we'll be seeking is as NUPLAZID is indicated for the treatment of dementia-related psychosis. And there are probably 2 key elements that we should touch on here: One is the – as I mentioned, we're seeking the treatment of dementia-related psychosis. So we're not looking at individual subtypes as they are often referred to of dementia. The psychosis that we see is very similar between the – irrespective of the underlying etiology and it responds in a similar way. So we're seeking that broad indication. That's supported by a very both alignment we established with the FDA at our end of Phase II meeting and then again at their pre-sNDA meeting when we submitted our application. The efficacy and safety data that we have, that underpins that indication, is very strong. We've got a well-established, safety and tolerability profile of the drug. Any time you file an sNDA, you need to collect all of the safety data you have from either prior or ongoing studies we've done that, all of that data continues to look very positive. If anything, the profile of the drug might look even a little bit cleaner than the very, very clean profile that we observed when we submitted in PDP.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

99.     The foregoing statements made by Defendant Davis were materially false and misleading because Defendants failed to disclose that the Harmony Study was not properly designed to evaluate the efficacy of pimavanserin and that the data supporting the sNDA was disappointing and not strong enough to support approval. Additionally, the assertion that the FDA agreed with Acadia on its approach was false.

100.    On February 24, 2021, Acadia issued a press release announcing the Company's fourth quarter and full year 2020 financial results. The press release stated:

> "Acadia delivered strong financial results in the fourth quarter and full year 2020, driven by robust sales of NUPLAZID in Parkinson's disease psychosis.  Additionally, we made significant advancements in two Phase 3 programs and further expanded our pipeline in pain and neuropsychiatry through strategic business development," said Steve Davis, Chief Executive Officer.  "In 2021, we are focused on delivering continued growth of NUPLAZID, the upcoming potential approval and launch of pimavanserin for dementia-related psychosis and advancing our business development strategy."

101.    That same day, Acadia hosted an earnings call with investors and analysts to discuss the Company's fourth quarter and full year 2020 results. During the 4Q20 Earnings Call, Defendant Davis stated, in relevant part:

> Additional highlights from 2020 include our submission of an sNDA for DRP. The FDA review is progressing as expected, and we look forward to the potential NUPLAZID becoming the first and only approved treatment for this indication, and the first new treatment in the dementia space in over 15 years.
>
> *     *     *
>
> The significant potential of pimavanserin, combined with our clinical pipeline, will drive meaningful long-term growth. We continue to grow NUPLAZID sales, and based on our 2020 performance and current outlook, we're providing net sales guidance for PDP in fiscal year 2021 of $510 million to $550 million.

39

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

We're on the cusp of a potential approval in DRP, a significantly larger market opportunity for which our teams have been preparing for approximately two years. We will be ready to execute on Day 1. In addition, we're advancing our pipeline with clinical trials across five separate indications.

102.    The foregoing statements were false and misleading because Acadia was not "on the cusp of potential approval in DRP."  Acadia was well on its way to a predictable rejection based on the Harmony Study's poor design and disappointing results submitted to support the sNDA, all of which were known to Defendants.

103.    On February 25, 2021, Acadia filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for the quarter and year ended December 31, 2020 (the "2020 10-K"). The 2020-10K was signed by each of the Defendants, with the exception of Defendant Stankovic. The 2020 10-K stated, in relevant part:

[W]e believe dementia-related psychosis (DRP), represents one of our most important opportunities for further development. In June 2020, we submitted to the FDA a supplemental New Drug Application (sNDA) for NUPLAZID for the treatment of hallucinations and delusions associated with DRP. In July 2020 the FDA notified us of their filing of our sNDA with a Prescription Drug User Fee Act (PDUFA) target action date of April 3, 2021.

104.    In addition, in a section discussing company strategy, the 2020 10-K stated, in relevant part:

Our strategy is to identify, develop and commercialize innovative therapies that address unmet medical needs in CNS disorders. Key elements of our strategy are to:

*       *       *

**Deliver pimavanserin to the market for the treatment of patients with dementia-related psychosis.** In June 2020, we submitted an sNDA for NUPLAZID for the treatment of hallucinations and

40

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

delusions associated with DRP. Our PDUFA target action date is April 3, 2021. In preparation for a potential U.S. launch, we plan to increase the U.S. sales force, including expansion of additional commercial, medical affairs and general and administrative support functions prior to obtaining regulatory approval for NUPLAZID in DRP. If approved, NUPLAZID will be the first and only FDA-approved treatment for DRP. [Emphasis added].

105. Appended to the 2020 10-K as exhibits were signed certifications pursuant to SOX by Defendant Davis, attesting that, "the information contained in [the 2020 10-K] fairly presents, in all material respects, the financial condition of the Company at the end of the period covered by the Report and results of operations of the Company for the period covered by [the 2020 10-K]."

106. The foregoing statements in the Company's 2020 10-K were materially false and misleading because Defendants failed to disclose that the Harmony Study was not properly designed to evaluate the efficacy of pimavanserin and that the data supporting the sNDA was disappointing and not strong enough to support approval.

107. Defendants' above-referenced statements were materially false and misleading and failed to disclose material adverse facts about the Company's business, operations, and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the materials submitted in support of the pimavanserin sNDA contained statistical and design deficiencies; (ii) accordingly, the pimavanserin sNDA lacked the evidentiary support that the Company had led investors to believe it possessed; (iii) the FDA was unlikely to approve the pimavanserin sNDA in its present form; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

**UNDISCLOSED FACTS KNOWN TO DEFENDANTS**

108. Throughout the Relevant Period, Defendants knew the following facts but failed to disclose them. Defendants had a duty to speak completely and

41
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

accurately, which includes disclosing any material fact necessary to make their statements not misleading.  Despite this, Defendants concealed these facts known to them, thus rendering the above-referenced statements false and misleading at all times.

109.   Pimavanserin was the first and only drug indicated specifically to treat patients suffering from PDP.  However, FDA approval does not mean that use of the drug is not without risk. To that end, in approving pimavanserin for PDP, the FDA asked that Acadia include a black-box warning, its strictest warning, on the drug's label, warning of its increased mortality in elderly dementia patients and explicitly indicating that "*Nuplazid is not approved for the treatment of patients with dementia-related psychosis unrelated to the hallucinations and delusions associated with Parkinson's disease psychosis.*" Thus, any use of pimavanserin to treat hallucinations and delusions not associated with PDP is "off-label."

110.   "Off-label" use is of concern when there is evidence of the low effectiveness or high risks associated with the use of a drug for a non-approved condition, and yet, it is regularly used. This type of off-label use is most common in psychiatry and is particularly of concern in patients suffering from dementia, as such use has been associated with increased risk of death.

111.   Cognizant of the risks associated with "off-label" use, the fact that dementia affects approximately 8 million people in the U.S., of which 2.4 million suffer from DRP, both of which are expected to grow as the population ages, Acadia sought to expand the use pimavanserin beyond its already approved PDP treatment by submitting its sNDA for the treatment of all hallucinations and delusions associated with *all* types of DRP.

112.   The issue is that DRP can be caused by a wide variety of very different underlying conditions – including Alzheimer's disease, dementia with Lewy bodies, Parkinson's disease dementia, vascular dementia, and

frontotemporal dementia spectrum disorders. Moreover, the patient profile of individuals with these conditions varies greatly with different patient groups responding to different treatments and facing different health and safety issues.

113.   Making things more complicated, not only does the neurobiology of psychosis in different neurodegenerative diseases like Parkinson's disease, Alzheimer's disease, and frontotemporal dementia differ, there is notable heterogeneity even among a single class of neurodegenerative diseases. Thus, bundling different types of DRP under one umbrella is exceptionally complex.

114.   Notwithstanding the foregoing, Acadia sought to expand pimavanserin's use across this broad population of patients and submitted to the FDA data collected primarily from its Harmony Study, supplementing that with data from the -019 Study focused solely on patients suffering from Alzheimer's disease psychosis.  Neither set proved to be persuasive, which Defendants knew or should have known would be the case long before filing the sNDA in June 2020.

**The Design of the Harmony Study was Flawed**

115.   Defendants knew that the Harmony Study did not effectively take into account the disparate nature of the individuals that Acadia was seeking approval to treat. Rather, there were insufficient numbers of patients for each subgroup analyzed, making it extremely difficult to determine whether pimavanserin was an effective treatment across the population of those suffering from DRP.

116.   Specifically, the Harmony Study enrolled 392 patients suffering from the five most common forms of DRP. 41 patients in this set were withdrawn for administrative reasons while 134 patients discontinued the trial early with 70 citing a lack of response, 27 suffering an adverse event, 17 withdrawing consent, and 20 leaving for other reasons, including failing to adhere to the trial regimen, violating a protocol, or receiving prohibited medication.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

117. With respect to each subgroup, the distribution of dementia diagnoses was as follows: 66.3% of the patients had their dementia identified as Alzheimer's disease related; 15.1% had their dementia identified as Parkinson's disease related; 9.7% had vascular dementia; 7.1% had dementia with Lewy bodies; and 1.5% had frontotemporal dementia.

118. This distribution is significant for two reasons: (i) it shows that the second largest subgroup in the entire study – a study put forward to extend pimavanserin's use to *new* indications – consists of patients suffering from Parkinson's disease dementia, a condition pimavanserin is *already* approved for; and (ii) it shows that the vascular dementia, dementia with Lewy bodies, and frontotemporal dementia subgroups, represented by a mere 73 patients, each lacked sufficient numbers to objectively demonstrate efficacy, particularly given the millions of patients in the U.S. alone suffering from DRP caused by these underlying conditions.

119. In any event, Defendants knew of these facts by early September 2019 when the trial was stopped for purportedly "positive" interim results, in December 2019 when the Company released the full data set as part of its presentation at CTAD 2019, and in June 2020 when the Company submitted its sNDA to the FDA relying significantly on this data.

**The Subgroup Data Submitted in Connection with the sNDA was Weak**

120. In addition to the foregoing, the limited data possessed by Defendants on each subgroup was poor and demonstrated a lack of efficacy, dooming the Company's sNDA from the outset, if not long before.

121. Specifically, in the Harmony Study, the supposed "positive" overall results were powered by a surplus of individuals with Parkinson's disease dementia, the condition for which pimavanserin was already approved, thus skewing the results in favor of pimavanserin. For example, in the double-blind portion of the study, a 43.4% placebo-adjusted improvement in relapse rate was

observed in PDP patients, which led to a 15.7% improvement observed among all patients enrolled in the study.  However, when PDP patients were removed from the overall group, the improvements observed in the relapse rate of all the other subgroups combined dramatically fell to 9%, which effectively equaled the result observed in the Harmony Study's largest group, Alzheimer's disease patients.

122.   In other words, the Harmony Study's data showed that, despite the small sample size, the drug was actually ineffective, or in some cases less effective (favoring the placebo), in the subgroups Acadia was seeking new approval for, further highlighting the deficiencies in the Harmony Study.

123.   Indeed, 17% of vascular dementia patients suffered a relapse irrespective of whether they were given pimavanserin or a placebo.  Moreover, 100% of frontotemporal dementia patients who received pimavanserin suffered a relapse compared to the 0% of these given the placebo.  Accordingly, pimavanserin demonstrated no benefits to patients suffering from these conditions.  Likewise, the in the Alzheimer's disease subgroup, 13% of patients given pimavanserin suffered a relapse, compared to 23% of patients who received the placebo, thus missing "statistical significance."  Evidently, the Harmony Study's "success" was driven by the PDP patients who were (improperly) included.

124.   Defendants knew that the Harmony Study trial data was damaging, especially without the PDP data relied upon, because the subgroups were too small. So, in an effort to bolster their sNDA submission, Defendants offered the -019 Study on Alzheimer's disease psychosis.   However, this data was also problematic for the following reasons:

125.   First, patient heterogeneity continued to be an issue.  Again, as an example, pimavanersin demonstrated particular effects on visual hallucinations in Alzheimer's patients, but any beneficial effect it might have for people with Lewy body pathology were not recognized in this trial.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

126. Second, the -019 Study was predicated on a single center study with no type 1 error control of secondary endpoints in which certain "protocol deviations" occurred, including the administration of "prohibited medications" to patients enrolled in the study, thus tainting the results.

127. Third, the -019 Study's designation of a primary efficacy outcome at six weeks, despite continuing double-blinded treatment for twelve weeks, led to a distorted picture of the treatment's efficacy. Specifically, the primary outcome for the -019 Study was the Neuropsychiatric Inventory-Nursing Home Version (NPI-NH) psychosis score (*i.e.,* the sum of the hallucinations and delusions scale scores) at six weeks of treatment. At six weeks, according to the Company's data set, Alzheimer's disease patients on pimavanserin observed a change in NPI-NH psychosis score of -3.76 points while patients given the placebo only saw a change in NPI-NH psychosis score of -1.93 points. Defendants represented this as being "statistically significant."

128. However, this result was not all that it seemed. What the data actually showed after continuing to treat patients until twelve weeks was that Acadia did not observe any effect on the NPI-NH psychosis scale at any other time during the twelve-week trial. Therefore, had the primary outcome been specified for twelve weeks (which is typical of trials with antipsychotics), pimavanserin would likely not have been considered efficacious at all – a particularly significant point as it completely undercuts the likelihood that pimavanserin could be approved for Alzheimer's disease treatment.

129. Finally, an assessment of the patient profile in the -019 Study showed that 17 of 18 secondary and exploratory outcomes and 6 of 7 subgroup analyses did not demonstrate evidence of efficacy, even though the Company at the time cherry-picked a finding that there was significant effect that favored pimavanserin within a subgroup of patients with more severe symptoms.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

130.   Despite Defendants efforts to highlight the best results and interim efficacy within the Alzheimer's disease population, the -019 Study's poorly analyzed data and flawed design, among other shortcomings, rendered the data set far from "supportive."

131.   Thus, Defendants knew, in any event, that the sNDA was doomed despite their repeated assertions to the contrary.

**Defendants Fabricate an "Agreement" with the FDA**

132.   Contrary to Defendants' repeated claims that the FDA and Acadia agreed to the pivotal Harmony Study's design, targeting a broad DRP patient population analyzed as a single group, during the end of Acadia's Phase II meeting, no such agreement actually existed.

133.   Since the enactment of Public Law 78-871 in 1962, drug manufacturers have been required to submit to and obtain approval from the FDA of a New Drug Application ("NDA") demonstrative the safety and efficacy of their drugs before being able to market them.  FDA approval of a NDA, or sNDA, seeking approval of a new use is conditioned in part on demonstration of effectiveness by "substantial evidence," defined as "evidence consisting of adequate and well-controlled investigations, including clinical investigations, by experts qualified by scientific training and experience to evaluate the effectiveness of the drug involves, on the basis of which it could fairly and responsibly be concluded by such experts that the drug will have the effect it purports or is represented to have under the conditions of use prescribed, recommended, or suggested in the labeling or proposed labeling thereof."   Food, Drug, and Cosmetic Act of 1973 § 505(d) (21 U.S.C. § 355(d)).

134.   The FDA has generally interpreted Congress' intent in requiring "adequate and well-controlled investigations" as referring to both the quality and quantity of data required to demonstrate effectiveness (S. Rep. No. 1744, Part 2, 87th Cong. 2d Sess. 6 (1962)), with at least two adequate and well-controlled

investigations demonstrating efficacy for a particular use required for both NDA and sNDA approval.   However, in select situations, where supported by the available science and data, the FDA has applied this framework in a flexible manner, approving NDAs and sNDAs based upon a single adequate and well-controlled study, supported by pertinent information from other adequate and well-controlled studies. Such flexibility has received Congressional approval through enacting the FDA Modernization Act of 1997 and, more specifically, Section 115(a) of the Act.

135.   Section 1199(a) of the FDA Modernization Act directed the FDA to meet with sponsors who request to meet, provided certain conditions are met, to reach agreement on the design and size of the well-controlled clinical trials intended to form the primary basis for a demonstration of the effectiveness in a marketing application submitted under § 505(b) of the Food, Drug, and Cosmetic Act or § 351 of the Public Health Service Act (42 U.S.C. §262).

136.   As set forth in the current Special Protocol Assessment ("SPA") provisions in §505(b)(5)(B) and (c) of the Food, Drug, and Cosmetic Act:

> [I]f a sponsor makes a reasonable written request to meet with FDA to reach agreement on the design and size of a trial covered by the statute, FDA will grant the request. ***If FDA and the sponsor reach an agreement, FDA will put the agreement in writing and make it part of the administrative record*** (see the User Fee Acts section in this Appendix for a discussion of FDA's performance goals for review). ***Neither FDA nor the sponsor may change an agreement after the trial begins*** except: (1) with the written consent of the sponsor; or (2) if the FDA division director determines that "a substantial scientific issue essential to determining the safety or effectiveness of the drug has been identified after the testing has begun." ***Should it be necessary for FDA to change or rescind an SPA agreement, FDA will first give the sponsor the opportunity for a meeting*** at which the FDA division director will be present and at which the director will document the scientific issue involved.  [Emphasis added].

137.   In the present case, no such writing reflecting an agreement between the FDA and Acadia providing for approval based upon results for the overall DRP population enrolled in the Harmony Study, and not subpopulations, exists. To be sure, had it existed, Acadia would have undoubtedly published the agreement, rather than referencing, in general terms, what is supposedly captured within it.

138.   In addition, there is nothing to suggest that the FDA offered Acadia an opportunity to meet to discuss the scientific issues involved in the sNDA. To the contrary, when Acadia was advised of the deficiencies in its application, it "immediately and repeatedly" reached out to the FDA for additional details, but "received nothing" in response.

139.   Finally, the FDA's history of issuing SPAs supports a finding that it is highly unlikely that the FDA *sua sponte* rescinded or changed its course.   In fact, since the FDA Modernization Act was enacted through 2016, the FDA has issued over 1,000 SPA agreements and less than 1% have been rescinded.

140.   As a result of the foregoing, it is implausible that a written or oral agreement ever existed between the FDA and Acadia. Even if a more general agreement existed permitting the Company to carry out a single adequate and well-controlled study, that agreement would be contingent on the data being supportive of the subgroups that Acadia sought to treat with pimavanserin, and that was evidently not the case.

141.   Defendants knew, at all times, that no such agreement existed between the FDA and Acadia. Accordingly, any assertions to the contrary, explicit or otherwise, were knowingly false and misleading.

**Defendants Took Advantage of their Misconduct to Sell Acadia Stock**

142.   On or about September 17, 2019, Acadia raised net proceeds of approximately $271.5 million in a follow-on public offering.  In the offering, the Company sold 7,187,500 shares of Acadia common stock.

143.    Throughout the Relevant Period, certain of the Defendants sold Acadia stock at artificially inflated prices while in possession of material, non-public information; that is, the true facts regarding the Company's sNDA submission and flawed studies, as alleged herein. As a result, each of the following Defendants profited from their wrongdoing by over $45 million, collectively.

144.    Defendant Davis sold 541,205 shares of Acadia stock for proceeds of $24,771,568. Much of Defendant Davis' sales during the Relevant Period were made pursuant to Rule 10b5-1 trading plans that were adopted by Defendant Davis during or just before the Relevant Period.  Prior to the Relevant Period, Defendant Davis had not sold any Acadia stock.

145.    Defendant Stankovic sold 368,993 shares of Acadia stock for proceeds of $18,932,729.   Much of Defendant Stankovic's sales during the Relevant Period were made pursuant to Rule 10b5-1 trading plans that were adopted by Defendant Davis during or just before the Relevant Period. Prior to the Relevant Period, Defendant Stankovic had not sold any Acadia stock.

146.    Defendant Daly sold 26,650 shares of Acadia stock for proceeds of $1,357,293. Prior to the Relevant Period, Defendant Daly had not sold any Acadia stock.

## THE TRUTH EMERGES

147.    On March 8, 2021, post-market, Acadia issued a press release providing a regulatory update on the pimavanserin sNDA, disclosing "that the Company received a notification from the [FDA] on March 3, 2021, stating that, as part of its ongoing review of the Company's [sNDA], the FDA has identified deficiencies that preclude discussion of labeling and post-marketing requirements/commitments at this time."  Acadia advised that "[t]he notification does not specify the deficiencies identified by the FDA and there has been no clarification by the FDA at this time."

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

148.   On this news, Acadia's stock price fell $20.76 per share, or 45.35%, to close at $25.02 per share on March 9, 2021.

149.   Then, on April 5, 2021, pre-market, Acadia issued a press release announcing that the Company had received a CRL from the FDA indicating that the pimavanserin sNDA could not be approved in its current form.  Specifically, the press release stated, in relevant part:

> Despite prior agreements with the Division of Psychiatry regarding the pivotal Phase 3 HARMONY study design targeting a broad DRP patient population analyzed as a single group, the Division, in the CRL, cited a lack of statistical significance in some of the subgroups of dementia, and insufficient numbers of patients with certain less common dementia subtypes as lack of substantial evidence of effectiveness to support approval.
>
> The DRP pivotal HARMONY study met its prespecified primary and secondary endpoints with robust and persuasive clinical and statistical superiority of pimavanserin over placebo, which was a prospectively agreed prerequisite for the DRP indication. Statistical separation by dementia subgroups and certain minimum numbers of patients with specific subtypes were not among the prespecified requirements.
>
> "Acadia stands behind the robustly positive results from the pivotal Phase 3 HARMONY study and the prospectively agreed trial design and criteria for establishing efficacy in DRP. Over the entire course of the review, the Division did not raise any concerns regarding the agreed upon study design, including the issues raised in the CRL," said Steve Davis, Chief Executive Officer of Acadia. "We will immediately request a Type A meeting to work with the FDA to address the CRL and determine an expeditious path forward for the approval of pimavanserin in DRP."
>
> The Division also stated in the CRL that it considers the Phase 2 Alzheimer's disease psychosis study -019, a supportive study in the sNDA filing, to not be adequate and well controlled, citing that it was a single center study with no type I error control of secondary endpoints in which certain protocol deviations occurred.   The Company believes these observations impact neither the positive

results on the study's primary endpoint, nor the study's overall conclusions of efficacy.

There were no safety issues or concerns raised in the CRL.

150.   On this news, Acadia's stock price fell $4.41 per share, or 17.23%, to close at $21.18 per share on April 5, 2021.

## DAMAGE TO ACADIA

### Securities Class Action

151.   As a result of Defendants' wrongdoing, as alleged herein, the Company is now the subject of a securities class action in the United States District Court for the Southern District of California in the case captioned *City of Birmingham Relief and Retirement System, et al. v. Acadia Pharmaceuticals, Inc., et al.*, Case No. 3:21-cv-00762-WQH-NLS (S.D. Cal.) ("Securities Class Action").

152.   The complaint in the Securities Class Action was initially filed on April 19, 2021, and an Amended Class Action Complaint was subsequently filed on December 10, 2021. The Securities Class Action alleges violations of federal securities laws against the Company, along with Defendants Davis and Stankovic.

153.   On February 15, 2022, the defendants in the Securities Class Action filed a Motion to Dismiss which was denied by District Judge Hayes on September 27, 2022.  Then, on October 25, 2022, defendants to the Securities Class Action filed a Motion for Reconsideration, requesting that the court reconsider the denial of the Motion to Dismiss. The Motion for Reconsideration was also denied by District Judge Hayes on February 2, 2023.

154.   The Company has had to expend significant sums in defending itself and Defendants Davis and Stankovic in the two years prior to the filing of this derivative complaint and will have to continue to expend significant sums on defending itself and Defendants Davis and Stankovic through the pendency of the Securities Class Action and any judgment or settlement that may result.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**Unjust Compensation**

155. At all relevant times, the Company paid lucrative compensation to each of the Defendants. The compensation paid to Defendants during the Relevant Period totals over $47.5 million, and is as follows:

| Defendant | Year | Salary/ Fees ($) | Stock Awards ($) | Option Awards ($) | Non-Equity Incentive Plan ($) | Other Comp. ($) | Total ($) |
|---|---|---|---|---|---|---|---|
| Baker | 2021 | 60,000 | 159,008 | 167,690 | - | - | 386,698 |
| | 2020 | 60,000 | 161,301 | 164,435 | - | - | 385,736 |
| | 2019 | 60,000 | - | 214,959 | - | - | 274,959 |
| Biggar | 2021 | 115,000 | 159,008 | 167,690 | - | - | 441,698 |
| | 2020 | 105,000 | 161,301 | 164,435 | - | - | 430,736 |
| | 2019 | 105,000 | - | 214,959 | - | - | 319,959 |
| Soland | 2021 | 70,000 | 159,008 | 167,690 | - | - | 396,698 |
| | 2020 | 70,000 | 161,301 | 164,435 | - | - | 395,736 |
| | 2019 | 70,000 | - | 322,439 | - | - | 392,439 |
| Brege | 2021 | 75,000 | 159,008 | 167,690 | - | - | 401,698 |
| | 2020 | 75,000 | 161,301 | 164,435 | - | - | 400,736 |
| | 2019 | 75,000 | - | 214,959 | - | - | 289,959 |
| Garofalo | 2021 | 60,000 | 159,008 | 167,690 | - | - | 386,698 |
| | 2020 | 37,500 | 155,053 | 150,805 | - | - | 343,358 |
| Daly | 2021 | 70,000 | 159,008 | 167,690 | - | - | 396,698 |
| | 2020 | 70,000 | 161,301 | 164,435 | - | - | 395,736 |
| | 2019 | 70,000 | - | 322,439 | - | - | 392,439 |
| Harrigan | 2021 | 70,000 | 159,008 | 167,690 | - | - | 396,698 |
| | 2020 | 50,000 | 161,301 | 164,435 | - | - | 375,736 |
| | 2019 | 50,000 | - | 322,439 | - | - | 372,439 |
| Davis | 2021 | 792,831 | 4,355,433 | 4,403,433 | 196,654 | 44,937 | 9,793,289 |
| | 2020 | 767,624 | 3,262,978 | 3,273,559 | 438,601 | 20,425 | 7,763,187 |
| | 2019 | 743,705 | 3,140,000 | 3,127,738 | 597,485 | 22,318 | 7,631,245 |
| Stankovic | 2021 | 739,377 | 1,957,468 | 1,979,073 | 149,008 | 44,711 | 4,869,637 |
| | 2020 | 715,869 | 1,864,547 | 1,870,608 | 379,813 | 25,577 | 4,856,415 |
| | 2019 | 693,563 | 1,932,331 | 1,924,767 | 517,401 | 20,208 | 5,088,270 |
| **TOTAL** | | 5,870,469 | 18,748,672 | 20,502,617 | 2,278,962 | 178,176 | **47,578,897** |

156. The Company paid the Defendants in connection with their respective roles as officers and/or directors of the Company. Accordingly, as part of their respective roles, the Defendants were required to, among other things, exercise due care and diligence in the management and administration of the affairs of the Company, act ethically and in compliance with all laws and regulations, maintain adequate internal controls, and conduct business in a fair and transparent manner. Further, each of the Defendants had additional duties and

responsibilities owed to the Company by virtue of their executive, directorial, and/or committee roles, as detailed, *supra*, for which they were compensated for.

157.   However, Defendants failed to carry out their duties adequately or at all, causing harm to the Company, as alleged herein.  Because Defendants failed to carry out their respective duties, the compensation they received during the Relevant Period was excessive and undeserved.   As such, Defendants were unjustly enriched by over $47.5 million to the detriment of the Company.

**Insider Selling**

158.   Defendants Davis, Stankovic, and Daly capitalized on the Company's artificially inflated stock price resulting from Defendants' false and misleading statements by selling substantial amounts of Company stock to garner substantial proceeds, as alleged herein.

159.   The total amount improperly gained by Defendants Davis, Stankovic, and Daly from their insider selling during the Relevant Period is over $45 million.

**Additional Damage to the Company**

160.   In addition to the damages specified above, the Company will also suffer further losses in relation to any internal investigations, or external regulatory investigations, and amounts paid to lawyers, accountants, and investigators in connection thereto as a result of Defendants' misconduct.

161.   As a result of the wrongs alleged herein, the Company will have to also expend on the implementation and maintenance of improved internal controls to prevent similar misconduct in the future.

162.   In addition to the above-specified damages, the Company has also suffered, and will continue to suffer, a loss of reputation and goodwill. The Company will also suffer a "liar's discount" which will plague the Company's stock price in the future.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

163.   Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of Defendants' violations of the law, and their breaches of fiduciary duties, waste of corporate assets, and other wrongful conduct as alleged herein.

164.   Plaintiff is a current owner of Acadia stock and has owned Acadia stock at all relevant times hereto. Plaintiff understands her obligations to hold Acadia stock throughout the pendency of this action and is prepared to do so.

165.   Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

166.   Following the alleged misconduct and damage, on August 30, 2021, Plaintiff served a pre-suit litigation Demand (the "Demand") on the Acadia Board, detailing the alleged misconduct and damage sustained by the Company. In the Demand, Plaintiff demanded that:

> [A] full corrective action be brought, including commencing legal proceedings against each of the current and former officers, executives and members of the Board named above, all of whom have been responsible for harming the Company as a result of the wrongdoing outlined in this letter. Claims against the disloyal directors, officers, and executives should be pursued for, *inter alia*, breaches of fiduciary duty, corporate waste, and unjust enrich. The Board should also consider and implement corporate governance reforms designed to address and prevent the breaches of fiduciary duty and lack of internal controls described herein.

167.   Attached hereto as **Exhibit A** is a true and correct copy of the Demand.

168.   Then, on January 11, 2023, following several communications throughout 2021 and 2022, counsel for the Board informed Plaintiff's counsel that:

> A Demand Review Committee was established last fall, but any

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

substantive inquiry into the allegations in the demand has been deferred pending resolution of the motion to dismiss in the securities class action (where Defendants' motion for reconsideration is currently pending).

169.   Attached hereto as **Exhibit B** is a true and correct copy of the counsel for the Board's response.

170.   As detailed above, the above-referenced Motion to Dismiss in the Securities Class Action was denied on September 27, 2022 and Defendants' Motion for Reconsideration was also denied on February 2, 2023. Despite this, the Board has failed to take any further action on behalf of the Company, thus constituting a refusal of the Demand.

171.   The Board's refusal to commence a civil action for an undetermined amount of time, if at all, is an improper and wrongful refusal of the Demand and will irreparably prejudice the Company and its claims. The wrongs complained of in the Demand remain uncorrected and the Company will suffer additional damage as a result.

172.   In addition, the Board's refusal could subject the Company's claims to the applicable statute of limitations period, leaving the Company without remedy. As such, the Board's refusal cannot be reasonably interpreted as being in the best interests of the Company.

173.   As such, the Board's response here is an unreasonable and wrongful refusal of Plaintiff's Demand to initiate an action for the benefit of the Company. The Company has suffered damage and will continue to suffer damage if the wrongs complained of herein remain uncorrected. Thus, Plaintiff has satisfied the demand requirements and may pursue this action to procure a judgment in Acadia's favor and should be permitted to proceed with this derivative action.

## CLAIMS FOR RELIEF

## COUNT I

### (Against Defendants for Breach of Fiduciary Duty)

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

174.   Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

175.   Defendants owed the Company fiduciary obligations.  By reason of their fiduciary relationships, Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

176.   Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, supervision, and good faith.

177.   Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the business prospects of the Company. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the materials submitted in support of the pimavanserin sNDA contained statistical and design deficiencies; (ii) accordingly, the pimavanserin sNDA lacked the evidentiary support that the Company had led investors to believe it possessed; (iii) the FDA was unlikely to approve the pimavanserin sNDA in its present form; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

178.   As a direct and proximate result of Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages.  As a result of the misconduct alleged herein, Defendants are liable to the Company.

179.   As a direct and proximate result of Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill.  Such damage includes, among other things, costs associated with defending and/or settling the Securities Class Action and severe damage to the share price of the Company's stock, all resulting in an increased cost of capital, and reputational harm.

## COUNT II

**(Against Defendants for Unjust Enrichment)**

180.  Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

181.  By their wrongful acts and omissions, Defendants were unjustly enriched at the expense of and to the detriment of the Company in the form of salaries, bonuses, and other forms of compensation, as detailed above.

182.  Moreover, Defendants were unjustly enriched through the unlawful insider selling of Company common stock at artificially inflated prices, as detailed above.

183.  Plaintiff, as a shareholder and representative of the Company, seeks restitution from Defendants, and each of them, and seek an order of this Court disgorging all profits, benefits, and other compensation obtained by these Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## COUNT III

**(Against Defendants for Abuse of Control)**

184.  Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

185.  Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence the Company, for which they are legally responsible.

186.  As a direct and proximate result of Defendants' abuse of control, the Company has sustained significant damages.  As a direct and proximate result of Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, the Company has sustained and continues to sustain significant damages.

187.  As a result of the misconduct alleged herein, Defendants are liable to the Company.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## COUNT IV

### (Against Defendants for Waste of Corporate Assets)

188.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

189.   By virtue of their positions of control and management, Defendants had a fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligation of fair dealings.

190.   As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, Defendants have caused the Company to waste valuable corporate assets by failing to disclose (i) the Company had a material weakness in its internal control over reporting; (ii) the Company's disclosure controls and procedures were not effective; and (iii) as a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

191.   Further, during the Relevant Period, each of the Defendants disseminated or approved public statements that failed to disclose or deliberately disregarded: (i) the materials submitted in support of the pimavanserin sNDA contained statistical and design deficiencies; (ii) accordingly, the pimavanserin sNDA lacked the evidentiary support that the Company had led investors to believe it possessed; (iii) the FDA was unlikely to approve the pimavanserin sNDA in its present form; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

192.   As a result of Defendants' actions, the Company has suffered losses and incurred substantial costs in investigating and defending itself against pending actions. The Company also has to incur the substantial costs of conducting internal investigations, as well as the costs of dealing with potential investigations by regulatory agencies.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

193.   As a result of the waste of corporate assets, Defendants are each liable to the Company.

## COUNT V

### (Against Defendants Davis, Stankovic, and Daly for Insider Trading)

194.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

195.   By reason of their fiduciary role as officers and directors of the Company, Defendants Davis, Stankovic, and Daly specifically owed the Company the highest obligation of due care, good faith, and loyalty.

196.   As officers and directors of the Company, Defendants Davis, Stankovic, and Daly were given access to material information about the Company, as described above, which was not generally available to the public.

197.   When Defendants Davis, Stankovic, and Daly sold their Company stock, they were in possession of material, non-public information described above, and sold Company stock on the basis of such information.

198.   The information described above was proprietary, non-public information concerning the Company's business operations, financial condition, and growth prospects.  It was a proprietary asset belonging to the Company, which Defendants Davis, Stankovic, and Daly misappropriated to their own benefit when they sold holdings in Company stock.  Defendants Davis, Stankovic, and Daly knew that this information was not intended to be available to the public.  Had such information been generally available to the public, it would have significantly reduced the market price of Company stock.

199.   As the use of the Company's proprietary information for their own gain constitutes a breach of Defendants Davis, Stankovic, and Daly's fiduciary duties, the Company is entitled to disgorge any illegal profits obtained thereby.

## COUNT VI

### (Against Defendants Davis and Stankovic for Contribution Under

**Sections 10(b) and 21D of the Securities Exchange Act of 1934)**

200.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

201.   Acadia, along with Defendants Davis and Stankovic, are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder.

202.   The Securities Class Action alleges that the class members relied, directly or indirectly, upon the false and misleading statements and omissions, as alleged herein, in purchasing Acadia securities. The Securities Class Action further alleges that, as a direct and proximate result, the class members suffered damages because the value of their investments were artificially inflated by the false and misleading statements and omissions, they purchased such securities at the artificially inflated prices, and the value of their investments fell when the truth was eventually revealed, causing economic losses to the class members.

203.   If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to the Defendants Davis and Stankovic's willful and/or reckless violations of their obligations as officers and/or directors of the Company.

204.   Defendants Davis and Stankovic, because of their positions of control and authority as senior executive officers of the Company, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts complained of herein and in the Securities Class Action.

205.   Accordingly, Defendants Davis and Stankovic are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the

application of a private right of action for contribution arising out of violations of the Exchange Act.

206.  As such, the Company is entitled to receive all appropriate contribution or indemnification from Defendants Davis and Stankovic.

## COUNT VII

### (Against the Proxy Defendants for Violations of
### Section 14(a) of the Securities Exchange Act of 1934)

207.  Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

208.  Defendants Biggar, Baker, Brege, Daly, Harrigan, Soland, Davis, and Stankovic (the "Proxy Defendants") solicited the 2020 Proxy Statement containing materially false and misleading statements and/or omissions.

209.  Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

210.  Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

211.   Under the direction and watch of the Proxy Defendants, the 2020 Proxy Statement failed to disclose that: (i) the materials submitted in support of the pimavanserin sNDA contained statistical and design deficiencies; (ii) accordingly, the pimavanserin sNDA lacked the evidentiary support that the Company had led investors to believe it possessed; (iii) the FDA was unlikely to approve the pimavanserin sNDA in its present form; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

212.   The Proxy Defendants also caused the 2020 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements, while failing to disclose that the Company's business, financial, and operational prospects were misrepresented as a result of false and misleading statements, causing the Company's share price to be artificially inflated and allowing the Proxy Defendants to wrongfully benefit from the unlawful and fraudulent conduct alleged herein.

213.   Moreover, the 2020 Proxy Statement was false and misleading when it discussed the Company's adherence to specific governance policies and procedures, including the Code of Conduct, due to the Defendants' failures to abide by them and their causing the Company to engage in improper practices and issue false and misleading statements and/or omissions of material fact.

214.   In the exercise of reasonable care, the Proxy Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2020 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2020 Proxy Statement, including but not limited to, election of directors and approval of executive compensation.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

215.   The misrepresentations and omissions set forth herein were material to shareholders in voting on the proposals in the 2020 Proxy Statement who would not have approved, *inter alia*: (i) the re-election of Defendants Daly and Harrigan to the Board; (ii) the director compensation policy; (iii) an amendment to the Employee Stock Purchase Plan to increase the number of shares authorized for issuance; and (iv) the compensation of the Company's executive officers.

216.   As a result of the Proxy Defendants causing the 2020 Proxy Statement to be false and misleading, Company shareholders approved the proposals set forth therein, including, *inter alia*: (i) the re-election of Defendants Daly and Harrigan to the Board of Directors; (ii) the director compensation policy; (iii) an amendment to the Employee Stock Purchase Plan to increase the number of shares authorized for issuance; and (iv) the compensation of the Company's executive officers.

217.   The Company was damaged as a result of the Proxy Defendants' material misrepresentations and omissions in the Proxy Statements.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for relief and judgment as follows:

A.   Against Defendants in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties, unjust enrichment, abuse of control, waste of corporate assets, and Section 14(a) of the Securities Exchange Act of 1934;

B.   Against Defendants Davis, Stankovic, and Daly for the amount of damages sustained by the Company as a result of their insider trading;

C.   Against Defendants Davis and Stankovic in favor of the Company for contribution under Sections 10(b) and 21D of the Securities Exchange Act of 1934;

D.   Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1   applicable laws and to protect the Company and its shareholders from a repeat
2   of the damaging events described herein, including, but not limited to, putting
3   forward for shareholder vote resolutions for amendments to the Company's By-
4   Laws or Articles of Incorporation and taking such other action as may be
5   necessary to place before shareholders for a vote a proposal to strengthen the
6   Board's supervision of operations and risk management, and develop and
7   implement procedures for greater shareholder input into the policies and
8   guidelines of the Board.

9       E.      Awarding to the Company restitution from Defendants, and each of
10  them, and ordering disgorgement of all profits, benefits and other compensation
11  obtained by Defendants;

12      F.      Awarding to Plaintiff the costs and disbursements of the action,
13  including reasonable attorney's fees, accountants' and experts' fees, costs, and
14  expenses; and

15      G.      Granting such other and further relief as the Court deems just and
16  proper.

17                      **JURY TRIAL DEMANDED**

18      Plaintiff demands a trial by jury on all issues so triable.

19  Dated: December 14, 2023

20                                  **WOLF HALDENSTEIN ADLER**
                                    **FREEMAN & HERZ LLP**
21

22                                  By: */s Betsy C. Manifold*
                                    BETSY C. MANIFOLD (182450)
23
                                    RACHELE R. BYRD (190634)
24                                  ALEX J. TRAMONTANO (276666)
                                    750 B Street, Suite 1820
25                                  San Diego, CA 92101
                                    Telephone: (619) 239-4599
26                                  Facsimile: (619) 234-4599
                                    manifold@whafh.com
27                                  byrd@whafh.com
                                    tramontano@whafh.com
28
                                    **GAINEY McKENNA & EGLESTON**
                                    Thomas J. McKenna

                                    65
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Gregory M. Egleston (to file *pro hac vice*)
501 Fifth Avenue, 19th Fl.
New York, NY 10017
Telephone: (212) 983-1300
Facsimile: (212) 983-0383
Email: tjmckenna@gme-law.com
Email: gegleston@gme-law.com

***Attorneys for Plaintiff***

66

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## **VERIFICATION**

I, ELLA KANNER, declare that I have reviewed the Verified Shareholder Derivative Complaint ("Complaint") prepared on behalf of Acadia Pharmaceuticals Inc. and authorize its filing. I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true. I further declare that I am a current holder, and have been a holder, of Acadia Pharmaceuticals Inc. common stock at all relevant times.


ELLA KANNER